We'll wrap up today with our last case. 25-8026 Western Watersheds Project v. United States Forest Service May it please the Court. My name is Megan Baxton and I am here on behalf of Western Watersheds Project, Rocky Mountain Wild, and Wild Earth Guardians. This case concerns the final decision in the 2020 Thunder Basin Plan Amendment. The District Court's refusal to vacate the Forest Service's unlawful plan, leaving indefinitely in place a management regime that radically increases poisoning, shooting, and allows unmitigated plague events at one of the last remaining black-footed ferret reintroduction areas in the world. Could you speak up a little bit, please? Sorry, thank you. Thank you. Is this better? Yes. Unless this Court directs otherwise, I intend to follow the order of issues in my briefing. Let's start with jurisdiction.  The administrative remand rule does not apply in this case. This is not a remand order. This is an order on vacature. Remand was the inevitable outcome of this Court's order on the merits. This Court returned this matter to the District Court specifically to apply the allied signal test. Well, we still have a final judgment rule, and the case is not over, usually, virtually always. That's what triggers the right to appeal. Has the Supreme Court ever allowed an appeal from a District Court decision where the case is still pending in District Court, where it's not done? There's still going to be further proceedings. It has to go back to the agency and then come back to the District Court and so on. Do you have any example of the Supreme Court allowing this sort of process under the statute that requires a final judgment before there's appellate jurisdiction? I think, oh my goodness, I think the characterization that you use, Your Honor, is a little different. This order is final because the question of whether vacature was the correct remedy, the correct outcome of the allied signal test for the 2020 plan amendment will never be before this Court again. When this matter is returned to the agency, the agency is going to issue a new decision. And if there is any further litigation, it will be over that new decision. The 2020 amendment will never come before this Court again. So what's your theory then? This is not a... Do you have other examples where the Supreme Court... Generally, we wait until everything's done and then you can appeal, raise all your issues. And it's very limited and the Supreme Court has been even more limited in the last 15 or 20 years in recognizing any exception to that. So there are lots of decisions that the District Court can make that aren't actually curable later on. And they still can't appeal until the case is completed. Do you have any examples of something like this? So this Court earlier today, I believe the second case had an example of what would be characterized as an adjudicative decision, the second immigration appeal. That case may be returned to the Immigration Board for another decision. And if that decision is something that the litigant wants to appeal to the District Court, and the District Court ends up producing another order that the litigant or the opposing party wants to appeal again, all of those issues will come back to this Court in a package. But that is not what will happen here. Again, when this matter is remanded to the Forest Service, the Forest Service is going to issue a new decision. The 2020 Plan Amendment will never come before this Court again. It will never be at issue again. Whether vacature was the correct remedy for the NEPA violations that this Court identified in its merits decision will never come before this Court again. This is the only opportunity that this Court will have, or any Court will have, to make that determination. You don't think that happens a lot? No, I don't. What about a court ordering a disclosure of an attorney-client communication? You are moving outside of my bandwidth. I'm very narrowly focused on environmental law. That's the leading Supreme Court decision in recent years, saying final judgment statute that permits appeals only from final judgment means everything's done. And courts have recognized some exceptions over the years. We did in Richardson. I'm not sure that that's going to hold up anymore. Richardson was not an exception. There was a remand to the agency, and we decided to review the case anyway. Richardson determined that the administrative remand rule did not apply. Right, right. And I'm not sure that we can do that anymore. Given what the Supreme Court's been saying in recent years, I'm not sure that we can have an exception to the administrative remand rule anymore. And that's one reason I asked, do you have any examples of the Supreme Court saying, even though the case has been remanded by the district court to the agency, we can still hear appeals from issues that arise in that case? We did in Richardson. This probably can be distinguished from Richardson, but I'm not sure that Richardson would be upheld by the Supreme Court at this point. That's why I asked for examples of when the Supreme Court has allowed an appeal from a district court decision when the district court has remanded the matter for further proceedings with the agency. I think to answer your question, Your Honor, we have to look at how nuanced this particular proceeding is. It doesn't fit squarely within what other types of civil litigation this court might see. This application of a specific test from the D.C. circuit produces a different result than what you might expect to see in other civil cases. Allied Signal looks specifically at vacature and the decision whether to vacate, which is the standard presumptive remedy that is applied in this sort of case, or whether to leave the agency decision in place while it issues a new decision. Allied Signal wasn't an appeal from a district court order remanding the matter to the agency, was it? I thought everything came up to the circuit court and then it decided what the district court should do on remand from the circuit court. Maybe I'm wrong about that. Well, the distinction that really happens here is that the Tenth Circuit has adopted a practice of returning a case to the district court for the vacature decision. The D.C. circuit and the Ninth Circuit do this all in one fell swoop. They'll look at the merits and then they will issue their vacature determination. So treating this as any different than what those other circuits do would create a circuit split. But this is a final decision as far as those circuits are concerned. There's no reason to treat it differently here. Well, I've said my piece on jurisdiction. If there are no questions on jurisdiction, we can go on to your next issue. If we had wanted to resolve the remedy question in the first appeal, could we have done that? You could have. You could have, Your Honor. I think there are probably some solid reasons for returning for a vacature determination, specifically because it is not constrained to the record in the same way that the merits are. And it affords litigants an opportunity to introduce new evidence specifically to the two allied signal factors. So there are two allied signal factors. The first being the seriousness of the violations that were identified and the disruptive consequences that might occur from vacature. When this circuit reviews a vacature determination, when any circuit reviews a vacature determination, it's done under the abuse of discretion standard. And this circuit has characterized that standard very similarly to APA review standard. Arbitrary, capricious, or manifestly unreasonable. And the district court's decision here ignored binding factual findings from this court and legal determinations from this court. It also applied the wrong legal test. One question. There was no request for a 54B judgment from the district court saying this issue of vacature should be appealed. Was there? There was not. Okay. Sorry. Go ahead. In determining the seriousness of the errors, there have been tests that I would say point to a question of how fundamental the violation is. And that is because NEPA is a process statute, a procedural statute. Looking at the outcome only, looking at whether the agency may be able to arrive at the same decision that it arrived at before, ignores that NEPA is a procedural statute and the violation is a violation of process. NEPA has twin aims, informing the decision maker and informing the public. For the purpose and need. Could I just try to maybe focus a question or two? Does the Forest Service bear the burden to show that vacature is unnecessary? It does, Your Honor. Has the Supreme Court or this court ever said anything otherwise? No, it has not, Your Honor. Okay, so I take it it's your position that in district court the Forest Service failed to meet that burden on Allied Factor 1 and Allied Factor 2. It is our position that they failed to meet that burden, but I don't think that we need to actually get to weighing the evidence. Because these errors that I already identified, the failure to acknowledge findings. But the Forest Service brought forward a declaration to try to convince the district court that Allied Signal 1 and 2 would be in their favor, and the district court agreed. And so it seems to me at this point what you need to tell us is why did the district court get that wrong? I would like to, Your Honor. Okay, can we start with Factor 1? We can. Okay. So it's important to remember as we move, as I move through these each individually that this court's merits determination also found that each of these violations compounded and exacerbated the others. The purpose of the violation, the court applied, the district court applied the wrong legal test, specifically what I just said. It looked at only the outcome. Whether the agency, and stated that the agency can justify the decision to only consider increased lethal control on remand. But again, NEPA is a process-based statute. Looking only at whether the agency will arrive at the same conclusion is not the right measure of the violation that this court identified. The purpose and need is an important part of an agency's NEPA process. It sets the scope. It decides what information will be considered by the decision maker, by the public, and what range of alternatives will ultimately be considered fully in the decision itself. The district court relied only on the dissenting opinion. This court's merits decision was never cited throughout the entirety of the application of allied signal factors. It also determined, this court also determined that the rationale that the agency offered in its final environmental impact statement to support its purpose and need argument was undercut by other evidence. And seeing that I'm running low on time, I'm going to try to wrap this up. That happened repeatedly. There were multiple factual findings that this court had in its merits determination that were simply ignored by the district court. To borrow from this court's former colleague, the district court may disagree with this court's merits decision, but it is not free to defy it. This court found that these legal violations were not substantiated by anything that was in the record. And in terms of the seriousness of the violations, the district court relied only on the dissent and the information that was already in the record. Meaning that nothing that the agency or the state submitted was considered as part of the seriousness of the errors. I'm sorry to interrupt, but your time's running out. She's going to have some time to rebuttal. I took too much time on jurisdiction, so you have time to ask questions.  All right. Go ahead. Well, no, I was ready to talk about disruption. We can move to disruptive consequences. I was encouraging you to ask your question. I'm sorry. No, that's all right. That's all right. So, on disruption. I think I understand from what you've said in your briefing what your argument is on the allied factor number one. But on number two, as I understand the declaration, there's a question or at least a statement that the prairie dog population on the grassland has grown or at least has remained stable between 2020 and 2024 without problems from plague. So, I guess my question is, then, why rock the boat with a vacatur? Plague episodic events happen very, very quickly. The 2017 crash is an example of just how quickly they moved. That crash resulted in a 99.9% die off of the prairie dog populations in the area. Yeah, but, Mike, that isn't my question. If things have remained pretty stable since 2020 when the plan was put in place through this court's previous opinion, what the government is saying is if you just toss the 2020 plan, that's going to cause some real disruption. And it doesn't sound like, compared to where things have been going, that that argument lacks merit. Why isn't the government correct? I'm sorry. I took kind of a winding path. So, two points to get there. And I'll start with where it was going. The problem is the plague mitigation plan that was put in place by the 2020 amendment. Even though prairie dogs have not suffered a plague episodic event as of yet, does not mean that the new 2020 plan amendment is preventing a plague episodic event. The thing that is lost between these two plans is a yearly plague mitigation plan. The 2020 amendment specifically allows the agency to withhold plague management for years at a time. So, think 2017 crash, but for years at a time. The second point is that the prior plan, the 2009 amendment, also did not see a plague event happen for nine years under that prior management. In fact, no plague event happened until 2017, which was the same year that the agency denied plague mitigation. There was no dusting that year. And then directly after that, we saw the population crash. So, those two things are serious concerns for the longevity of the population. Even if it has not presented a plague outbreak as of yet, should it present a plague outbreak, we have vastly reduced prairie dog colonies. So, a 99.9% crash would result in even fewer prairie dogs, meaning that even fewer of the at-risk species that rely on prairie dogs would be able to survive long-term. There is increased poisoning. There is a new kind of poison. There is experimental poisoning. And now there is yearly recreational shooting that is allowed, again, in combination with a plague mitigation plan that allows the agency to withhold plague mitigation for years at a time with really no understanding of when or why they might do that. Did you have a further question? You sure? Yes. Okay. Did you have a question? No. Okay, thank you. You'll have another chance to respond. Okay. Okay. Still morning. Good morning, Your Honor. May it please the court. Amy Collier on behalf of the federal defendants. I plan to use about 10 minutes and leave five minutes for the state of Wyoming to argue as well, and I'll try to stick to my clock. I'd like to start just where we left off on the merits and the disruption. In this court's prior decision, it explicitly left to the district court to conduct this fact-intensive inquiry about what's happening on the grassland right now, what the conditions are, and how these allied signal factors would play out. The district court did that, followed this court's instructions, took declarations and briefing from the parties, and made this factual analysis, finding that it would actually be more environmentally harmful to vacate this plan, to go back to what was in place many years ago, and sort of yo-yo between these management regimes. It would risk this sort of boom and bust population cycle of the prairie dogs that the Forest Service had been trying to address. It would remove certain tools that the Forest Service had to address those problems. What was the evidence beyond the declaration from Mr. Bacon? Wasn't that the Forest Service evidence in district court? That was the Forest Service evidence, yes. There wasn't declarations, plural. It was just Mr. Bacon's declaration. I think the state might have had one, but yes, from the Forest Service, there was just one declaration. And again, this is, you know, the person that is responsible for managing this grassland on a day-to-day basis has consistent experience with both the prior management regime and the current one, and understands how those sort of factors play out. I don't think there's any abuse of discretion in the district court crediting those findings, crediting those statements from the forest supervisor in that declaration, and making those factual findings, particularly about the disruptive consequences. I would also just like to highlight, you know, the appellant's focus on the concern about being able to treat plague, and that plague, you know, takes a while to sort of show up. But that's just speculation that the current plan in place will not be able to handle those developments. And the district court didn't need to speculate in the face of this record that leaving the plan in place might lead to those outcomes. There are also other parts of the plan amendment that make the Forest Service more confident in its ability to handle potential plague outbreaks. And that includes the smaller, more controlled and managed prairie dog population. So you're not seeing the population expand out of control, finding it harder to prevent plague spread between colonies. And then also the use of new plague treatments that the Forest Service did not have available under the prior plan. This is the FIPP-Rennell argument? The FIPP-Rennell, yes. Okay. Yeah, so I mean, looking at the plan cohesively, it's not these sort of individual pieces, but the plan together has worked well, and the Forest Service has found, as expressed in the declaration, that it is maintaining a stable population. On the first allied signal factor, I just want to emphasize to the court, I think appellants have pointed out or have argued that, you know, vacater is the appropriate remedy. You don't look at whether the agency would do the same thing on remand. You know, recently in Sevin County, the Supreme Court actually said the exact opposite. In NEPA cases, there's no reason to vacate the decision, absent reason to believe the agency wouldn't select the same project. But that case didn't talk about allied signal, did it? It did not. It wasn't a vacater case, was it? It was not. I mean, it was on the merits of the NEPA analysis. Let's get back to allied factor one. Yes. I had a question about that. This court's decision in 2024 called on the Forest Service to identify these deficiencies. And Mr. Bacon, in his declaration, says, well, we can explain ourselves on the deficiencies. But it seems that the previous panel was looking for more than just an explanation. It recognized the deficiencies and remanded for the agency to correct the deficiencies. And Mr. Bacon's declaration does not address how or whether or what progress has been made relative to those deficiencies. So how has the Forest Service met its burden on allied signal factor one? So two points on that, Your Honor. I think looking at the prior decision, yes, the court found errors with the purpose and needs statement, the alternatives, and the combined effects analysis. But in each of those, the court also noted, you know, if the Forest Service needs these, for example, the expanded lethal control measures, if it needs that and that's one of the needs, there's no explanation in the record for why it was limiting its analysis to that. But that isn't all that the court did there. It recognized three deficiencies. And just saying, well, we can explain why the purpose and needs statement was too narrow, that isn't what the court's deficiency was. It was too narrow. And why wasn't the agency, why didn't the agency come back and say, okay, here's how we're going to fix that? But I didn't see that in Mr. Bacon's declaration. Is it there? I don't see that particularly in the declaration. But in this court's decision, it distinguished this case from, for example, the Fuel Safe Washington case, where there was a narrower range of alternatives and purpose and need, but the agency explained why it needed that narrow. Well, even the declaration doesn't even say how it's going to explain. Say, don't worry, we can tell you, we'll be able to tell you why we have these deficiencies. It doesn't really say much of anything else. And it just seems to me that the declaration that was submitted is very thin on the allied signal factor one. So I would disagree a little bit. I mean, particularly on combined effects, the Forest Service supervisor says that it will explain. Yeah, when is it going to do that? I mean, the decision came down in 2024. It's had two years. Has anything happened? I know the Forest Service is working on it. I don't have an update. I know the declaration says that the agency is taking this seriously and moving with urgency like it did before. I would point out that, you know, appellants could have asked the district court to impose some sort of timeline, and they didn't choose to. They just wanted Bakatter completely. So the district court didn't impose a timeline, but that's partially because the appellants didn't ask for that. Well, but one thing that goes with Bakatter is still fixing the deficiencies. And so once the decision is made, unless you're going to appeal to the Supreme Court, doesn't the agency have an obligation to get to work on what the problem is? And I think the agency is getting to work. It's working on it. It hasn't finalized it. Yeah, it didn't report that to the district court. Well, the declaration, of course, came much earlier than we are now. But, I mean, I think the district court, the forest supervisor, again, stated in the sworn declaration that this was important to the agency, and the agency will move with urgency. And I think the district court was fair to credit that statement in the sworn declaration. I do want to also just highlight that I know Seven County— How long after remand was that declaration made? How long after—from this court? Yeah. I think it was filed in February of 2025. So four or five months or four months, maybe. But going back to sort of the errors that were identified by this court, the Supreme Court in Seven County emphasized, as this court has emphasized in the past, that NEPA imposes no substantive restrictions on the agency's decision on crafting purpose and need, as long as the agency reasonably explains its decisions. It seems like you're trying to relitigate the earlier case. I'm not trying to relitigate it. I did say you were. No, I think that it provides, again, a gloss over, you know, what the agency needs to do on remand to fix. Look, this court said there were three deficiencies, all right, and was pretty specific and straightforward about what they were. Mr. Bacon comes and says, well, we can explain. And that's it. And you have the burden to show that vacatur is unnecessary. How does that meet that burden? So the question in the first allied signal test factor is whether there's a serious possibility that the agency will be able to cure the deficiencies on remand. It's not a guarantee that the agency will, but is there a serious possibility that the agency can cure those deficiencies? And I don't think that appellants have shown any abusive discretion in the district court finding, again, on that record, that there was no serious possibility that the Forest Service would adopt the same plan. I think you're reversing burden a bit here. I understand. Well, a burden on appeal. Well, what about the burden in district court? I think that the agency's declaration where the Forest Service says we will fix. The district court decides to rely on the dissent to get to its conclusion. And we have this declaration from Mr. Bacon. I mean, I think I understand your argument about allied signal step two. Yeah. I'm having some problem with number factor one. Yeah. I appreciate that. And again, you know. Let's say we end up saying, well, we're not sure about factor one, but maybe the government has something on factor two. What do you do with that? What do courts do when the two factors need to be weighed? So this court has said that in the Western Watersheds, I think, versus Holland case, that a strong showing on one factor obviates the need to consider the other factor. What if they're in equal points? Well, I don't think the district court found they were in equal points. No, I know. I don't think so. I mean, again, I think, you know, this court. What if they are? I don't know if we have a case on that particularly. But, again, this court remanded to the district court to make these factual findings and draw these conclusions. The district court was very familiar with this case, did what it was asked to do, and found that the second factor weighed heavily in favor of remanding without vacater. And I don't think there's any abuse of discretion in that decision. I would like to touch on jurisdiction, if I may, really quickly. Hopefully not eating too much of my colleague's time. I recognize that this is a relatively unique case. I haven't found any cases where the only issue on appeal is a decision to remand without vacater. But looking at this court's prior decisions, this court says, of course, that the final judgment rule, the remand rule is most appropriate in adjudicated cases. But it doesn't say it's only appropriate in those cases. In all of those cases, it goes on to look at the nature of the district court decision. And here, the nature of the district court decision is remanding to the agency to conduct further NEVA, conduct further analysis. That squarely falls within this court's remand rule. How about the collateral order doctrine? Would it apply? Well, appellants haven't raised that as a reason. Well, it's jurisdictional, so it's fair game. It is, but appellants still bear the burden of identifying reasons for this court. No, no, it's jurisdictional. We can raise it. You can raise it. Anybody. I mean, we have a responsibility to raise it. So what about it? I would push back a little bit on, I think it's the Raley decision from this court, that it's appellants' burden to identify the basis for jurisdiction.  I'm not prepared. I can't accept that, but do you have a position on that? I am not prepared to discuss it because it hasn't been briefed and raised. Fair enough. And well developed. I would just add, finally, that I don't think any of the exceptions to the remand rule are applicable here. I think the only one they raised was practical finality, and I think it's just not squarely on point at all. I have one quick NEPA question. Yeah. Do you think that the NEPA compliance, or lack of, by the agency in this case wouldn't pass muster under the most recent Supreme Court decision? I think, you know, we didn't brief that. I don't think the court has to reach that decision here because it's not— Well, I would think it would be very relevant in determining what interim relief would be. I do think it's very relevant in terms of, you know, the language about vacater, but also just generally the deference to agencies in making, in drawing the line at the various stages in the NEPA process. The deference to agencies in making these factual scientific conclusions, the deference to the agencies in picking alternatives, picking purpose and need statements. The Supreme Court said that a course correction of sorts is required in these NEPA cases, and I think, you know, that just provides a gloss over, you know, both factors of a rallied signal. Thank you. And we ask the court to dismiss or affirm the judgment. Good morning, your honors. Shannon Leninger for the state of Wyoming. May it please the court. I'd first like to touch on the other evidence that was before the district court on the disruptive consequences. The state also provided evidence of encroachment harms that were under the prior decision and how it hurt the enamoring communities. I don't think she was given 15 minutes. Pardon? I thought the 15 minutes was for the two, so the clock shouldn't have started again at 15 minutes. That's right. Well, we'll ignore the clock. Just don't take too long. Thank you, your honor. And this is very important because Game and Fish is the one who controls ferret reintroductions in the state of Wyoming, and it is a necessary factor for ferret reintroductions to have local landowner support for reintroduction. And going back to the prior plan is going to actually get the plaintiff's goals of getting ferret reintroduction go backwards. And that was especially since this plan was a negotiation. The Wyoming Department of Agriculture brought together different stakeholders to try and create solutions. Amongst the stakeholders were wildlife organizations, private landowners, and other county and state entities. The managing towards 10,000 acres that is in the 2020 plan was a compromise between those viewpoints. Local organizations and landowners only wanted between 300 to 7,000 acres in the management area, whereas wild groups did not want to reduce from the original 18,000. The state of the maintaining prairie dog-related species requires around 10,000 acres. Going back on that plan after there was a lot of negotiations to try to get where we are is going to undermine trust in the area, and it's going to make it harder to get people to come to the table again. And that was evidence the state provided to the court about why vacature was not equitable and would have disruptive consequences. Second, the group's argument that NEPA requires it's about the procedure is undermined by either own authorities. On page, in their brief, I think it's page 12 of their reply brief, Montana Wildlife Federation, what they're citing was about a FLIPMA violation, and that court, which has cited two different cases within that one decision, on the next page, on page 52, talking about a NEPA decision, says, but there is a greater likelihood the agency could substantiate it's decision on remand after affording more opportunities for public participation. So generally, it is about the decision and whether they could substantiate that on remand. But overall, this is about whether we keep the current plan in place, or we go back to a prior unworkable plan, that the risk is going to be borne by the communities in this intermingled area, and not by the groups that are here before this court. Thank you. Thank you, counsel.  I'll give you a minute and a half for rebuttal. Try it. You can do it. I think it would be best to focus on disruptive consequences. And I think it would be best to focus on the agency's three prior determinations, that substantially similar management, or even identical management, in the instance of the 2013 viability analysis, has the potential to lead to the eradication of prairie dog colonies in the area. The agency has not offered, did not offer, and has not offered, a reasoned basis. This is taking from the seven county decision. Seven county decision says reasoned basis. Reasonable and reasonably explained. They did not reasonably explain it in the merits decision. They did not offer any reasonable explanation on remand. That risk, a very real risk of eradication, remains if this plan remains in place, according to the agency itself. To the point about reintroduction of black-footed ferrets. This plan harms that reintroduction. Looking only at the acreage mistakes all of the other components of this plan that are in place, that are themselves known risks to ferret reintroduction. Poisoning is considered a high magnitude imminent threat to ferrets at reintroduction areas. Fumigant poisons, which are allowed in the boundary areas, are also a direct threat to ferrets. Recreational shooting is a direct and indirect threat to ferrets. All of this management is a threat to ever reintroducing ferrets onto the grassland. The question before this court is whether there is a serious possibility that the agency can substantiate its decision to skip a procedural step on remand. And the declaration that was submitted by this agency does not demonstrate a serious possibility. In fact, it demonstrates that the agency didn't even really understand what the violations were before it, as Judge Nelson has alluded to in his line of questioning. Thank you, Counsel. Thank you. You've got two minutes. Thank you, Counsel. Case is submitted. Counselor excused. We're in recess until 9 or 8.30 tomorrow morning. Do you mind? 8.30 tomorrow morning.